IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 14, 2017

## STATE OF TENNESSEE v. DWAYNE SCOTT FRANKLIN

**Appeal from the Circuit Court for Marshall County**
**No. 16-CR-17      Franklin L. Russell, Judge**

_____

### No. M2017-00180-CCA-R3-CD

_____

A jury convicted the Defendant, Dwayne Scott Franklin, of three counts of rape of a child, a Class A felony. The trial court imposed sentences of twenty-five, thirty, and thirty-five years in prison for the crimes, and the sentences were ordered to run partially consecutively for an aggregate sentence of sixty years. The Defendant appeals, challenging the sufficiency of the evidence, the State's alleged failure to preserve evidence, and sentencing. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Donna L. Hargrove, District Public Defender, and Michael J. Collins (at trial and on appeal) and William J. Harold (at trial), Assistant District Public Defenders, for the appellant, Dwayne Scott Franklin.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Robert J. Carter, District Attorney General; and Weakley E. Barnard and William B. Bottoms, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Defendant raped the victim multiple times when she was seven years old, while she was at his home playing with his two daughters. The abuse came to light

approximately two years later. The victim described the crimes at trial, and the victim's mother, the Defendant's wife, and one of the Defendants' daughters confirmed details surrounding the crimes.

The victim's mother and Defendant's wife, Mrs. Franklin, had been friends for a number of years and lived in the same apartment complex in the late summer and early fall of 2013. The Defendant and Mrs. Franklin had two daughters, who were approximately two and three years older than the victim. The three children frequently visited one another's homes, and Mrs. Franklin testified that they played together daily, sometimes at the playground located at the apartment complex.

The Defendant's family lived on the second floor, and Mrs. Franklin testified that the windows in the apartment's living room and bedroom faced the playground which "made it really easy to watch the kids." She noted that she could see the playground from the bed by lifting the blinds in the bedroom. The bedroom had a box spring and mattress on the floor. Mrs. Franklin testified that the Defendant had moved out of the apartment and was living with a friend by April of 2013 but that he occasionally returned to the apartment to watch the children while she worked the "late shift." The victim and her mother both testified that the Defendant lived at the apartment at the time of the first two rapes.

The victim testified regarding three rapes that occurred while the Defendant was alone with the children. The first rape occurred after the start of the school year in 2013, when the victim went to Mrs. Franklin's apartment to see if the Defendant's daughters wanted to play. The girls watched television for a little while and were leaving to go to the playground when the Defendant called to the victim. The other girls continued outside, and she went into the Defendant's bedroom, where he told her to sit. There were no chairs, and she sat on the bed, which she described as a mattress on the floor. The Defendant told her to lie down, and when she said she did not want to, he repeated the command in a manner that was "meaner." The Defendant put an orange towel over the victim's head, pulled down her pants and underwear, told her to spread her legs out, and raped her. Although the victim could not see, she testified that the Defendant penetrated her vagina with something hard and warm that felt "like skin." The victim was in pain. The Defendant heard his daughters coming, stopped, and told the victim not to tell anyone. The victim went out and played with the Defendant's daughters for approximately twenty-five minutes. It began to get dark, and she went home.

The victim took a shower at home and left her clothing on the floor. The victim's mother found the victim's underwear, which had blood in the crotch. She asked the victim about it, and the victim told her she had been climbing on the counter and had fallen on a cabinet door. The victim's mother testified that she accepted this explanation

- 2 -

because climbing on the counters was characteristic behavior for the victim. The victim testified that she lied to her mother because she was scared of the Defendant.

The victim testified that approximately two weeks after the first rape, she again went to Mrs. Franklin's apartment to ask the Defendant's daughters to play with her. Again, as the girls were leaving the apartment, the Defendant called to the victim. The victim was scared, but she went into the bedroom. The Defendant shut the door and again told her to lie down. When the victim resisted, he pushed her down. He again used the orange towel to cover her head while he raped her vaginally. This time, the victim was wearing a long-sleeved rather than a short-sleeved T-shirt. During the second rape, the victim heard the Defendant move the blinds on the window which looked out on the playground where the other girls had gone. The girls were coming in, and the Defendant pulled the victim's pants up and told her not to tell. The victim thought she might get in trouble, so she did not tell anyone about the abuse until two years later.

The Defendant moved into a different apartment complex on September 11, 2013. The Defendant's lease, showing the dates of tenancy, was introduced into evidence. The third rape took place in the new apartment, where the Defendant lived alone. Mrs. Franklin testified that although they were separated, she frequently left the children with the Defendant while she worked. She was familiar with the new apartment, and the bed in the new apartment consisted of a mattress on the floor.

The victim and the Defendant's daughters had spent weeks planning a sleepover which was to occur a week before Halloween. The victim recalled that she was planning to go to a haunted house the day following the sleepover. The girls discovered that the Defendant's daughters would be at the Defendant's home on the day they had planned the sleepover, so the girls decided to have the sleepover at the Defendant's new apartment. The victim's mother testified that she dropped the victim off at the Defendant's new home. The new apartment complex had a tree house which the Defendant's daughters wanted to show to the victim. The three girls were again leaving the apartment when the Defendant called the victim to his room. Again he pushed her down onto a mattress on the floor, put the same orange towel over her head, removed her clothing, and penetrated her vaginally. When he heard his children return, he replaced the victim's clothing and told her not to tell anyone. The victim testified that she was with the Defendant approximately thirty-five minutes during the third rape and a little longer during the others. She acknowledged that when she spoke to Detective Tony Nichols, who replaced Detective Chad Bass as the detective assigned to the case, she only told him about the first rape. She testified that she thought he knew about the others and that she only mentioned the rape where she experienced bleeding afterwards.

Mrs. Franklin and the Defendant's eldest daughter confirmed that the Defendant had an orange towel. Mrs. Franklin testified that it was a "burnt orange" and that the Defendant took it with him when he moved. The Defendant's eldest daughter also confirmed that the victim spent the night at the Defendant's new apartment, that the three girls were going to look at the tree house, and that the Defendant called to the victim as they were leaving. The Defendant's eldest daughter testified that she and her sister continued to the tree house and shot their new BB guns for "probably" less than ten minutes. She did not, however, look at a clock or watch to see how long she was gone. She acknowledged that the victim did not seem to mind coming to their home.

Detective Nichols confirmed that the playground was visible from the bedroom window of the apartment the Defendant had shared with his wife and children. He acknowledged that he did not send the victim for a forensic medical examination as part of his investigation. He testified that he was assigned to the case in 2016 and would not have expected an exam conducted close to three years after a sexual assault to reveal anything. Detective Bass, who investigated the case in August 2015, also testified that he would not expect to find physical evidence from a forensic examination conducted two years after a rape. He testified that he did not want to force the victim to undergo a traumatic physical examination which was unlikely to yield evidence. While the victim's mother did not tell Detective Bass about finding blood in the victim's underwear, he stated that it was "doubtful" that he would have sought an examination had he known about the blood.

The jury convicted the Defendant of three counts of rape of a child. At sentencing, Detective Nichols testified about a fourth rape that was not prosecuted. According to Detective Nichols, the Defendant asked the victim's mother if he could take the victim to the store with his children. Instead, the Defendant drove her alone in his pickup truck to a deserted area where he again covered her head and raped her. The victim was able to give a description of the area, noting there were no cars and a red barn on the left side of the road. Detective Nichols and the victim's mother tried to find the location by asking the victim to guide them as they drove. They had agreed ahead of time not to make any suggestions and to simply follow the victim's directions. The victim guided them to a deserted road. Detective Nichols and the victim's mother observed a red barn on the left side of the road, but they did not say anything because they did not want to taint the victim's memory. The victim did not identify the area as the place where she was raped, and the fourth rape was not charged because the State did not believe it could establish venue.

The victim's mother confirmed Detective Nichols's account of the fourth rape. She testified regarding the profound impact the rapes had on the victim. The victim was initially a rambunctious, outgoing child who enjoyed socializing with both children and

adults. She was a "tomboy" who would ask to spend the night with her grandparents, and she was on the honor roll at school. After the rapes, the victim's grades fell to Ds and Fs, and she did not want to leave her mother's side. The victim's mother testified that the victim would "stay[] at [her] hip," did not want to socialize, and did not want to stay with her grandparents overnight. The victim's family had trusted the Defendant because the victim's mother had known him for seven or eight years and her boyfriend had known him for thirty years.

The trial court sentenced the Defendant to twenty-five years for the first rape, thirty years for second rape, and thirty-five years for the third rape. The thirty- and thirty-five-year sentences were ordered to run concurrently with each other but consecutively to the twenty-five-year sentence for an aggregate sentence of sixty years. The Defendant appeals.

## ANALYSIS

The Defendant asserts that the evidence is insufficient to support the convictions, noting inconsistencies in the testimony. The Defendant also challenges the State's alleged failure to preserve evidence by not obtaining a physical examination of the victim, and he objects to the aggregate length of his sentences.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support the verdicts. He argues that the testimony was inconsistent, noting that the Defendant's daughter testified she was only at the tree house for ten minutes and that the victim told her mother she fell onto a cabinet door to explain the blood in her underwear.

Tennessee Rule of Appellate Procedure 13(e) requires a finding of guilt to be set aside if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. When a court evaluates the sufficiency of the evidence, it must determine "whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). This court neither reweighs nor reevaluates the evidence, nor may it substitute its inferences for those drawn by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Id.* This court must afford the prosecution the strongest legitimate view of the evidence and all reasonable

inferences that may be drawn from it. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005).

Here, the Defendant was convicted of rape of a child. To establish the offense as charged, the State had to prove beyond a reasonable doubt that the Defendant engaged in the unlawful sexual penetration of the victim and that the victim was more than three but less than thirteen years of age. T.C.A. § 39-13-522(a). Sexual penetration includes sexual intercourse and "any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's." T.C.A. § 39-13-501(7).

The evidence established that the Defendant committed three counts of rape of a child. The victim, who was seven at the time of the offenses, testified that on three separate occasions the Defendant covered her head with an orange towel and penetrated her vagina. Her testimony was corroborated in various ways by witnesses who confirmed the configuration of the Defendant's homes, his ownership of an orange towel, the victim's presence in his home on several occasions, and the victim's physical injury resulting from the first rape. The victim lied to her mother regarding the blood in her underwear but explained that she did not tell her mother the truth because she was afraid of the Defendant. While the Defendant's daughter testified that she was gone for less than ten minutes during the third rape and the victim estimated it was thirty-five minutes, the Defendant's daughter acknowledged that she did not look at a watch. Inconsistent testimony is only a basis for overturning the verdict when "inaccuracies or inconsistencies that 'are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt.'" *State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (quoting *State v. Radley,* 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). The duration of a rape is not an element of the offense, and a variation in children's estimates of the passage of time does not come close to satisfying the *Elkins* standard. The jury evaluated the credibility of the witnesses, and the evidence abundantly supports the convictions.

## II. *Ferguson*

The Defendant also contends that the failure to obtain a medical examination of the victim amounted to a failure to preserve evidence under *State v. Ferguson.* 2 S.W.3d 912, 915-17 (Tenn. 1999) (holding that the loss or destruction of evidence by the State must be analyzed to determine if it amounts to a due process violation). However, the Defendant's contention is misplaced. As the State notes, the decision to obtain a forensic medical examination pertains to the investigation of the case. *See State v. Brock*, 327 S.W.3d 645, 699 (Tenn. Crim. App. 2009) (noting that the State has no duty to

investigate in any particular way and accordingly had no duty to collect fingerprint evidence or a bloody footprint). Moreover, we agree with the State that the issue is waived because the Defendant raises it for the first time on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Howard*, 504 S.W.3d 260, 277 (Tenn. 2016) ("It is well-settled that a defendant may not advocate a different or novel position on appeal."); *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived.").

### III. Sentencing

The Defendant does not specifically take issue with the length of his sentences or the fact that the sentences were ordered to run partially consecutively. Instead, he simply contends that the aggregate length of sixty years is excessive and "greater than that deserved for the offense committed." T.C.A. § 40-35-103(2). The State interprets this as a challenge to the partially consecutive alignment of the sentences and argues sentencing was proper.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

In determining the sentence, the trial court must consider: (1) the evidence at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. T.C.A. § 40-35-210(b).

The trial court sentenced the Defendant in the appropriate range for all three sentences. *See* T.C.A. §§ 39-13-522(b); 40-35-112(b)(1). The court enhanced the second and third sentences based on a previous history of criminal behavior consisting of the previous rapes simultaneously adjudicated. *See* T.C.A. 40-35-114(1); *State v. McKnight*, 900 S.W.2d 36, 54 (Tenn. Crim. App. 1994) (holding that simultaneously adjudicated offenses could qualify as prior criminal history because the offenses occurred over a period of time and did not constitute a single course of conduct), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886, 899-900 (Tenn. 2013); *State v. Cummings*, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992) ("Although he has no prior criminal convictions on his record, his criminal behavior because of the multiplicity of counts is a factor."). Furthermore, the trial court was presented with evidence that the Defendant committed a fourth rape for which he was not charged. *See State v. Carico*, 968 S.W.2d 280, 288 (Tenn. 1998) (holding that uncharged sexual contact with the victim constituted prior criminal history).

The trial court then based consecutive sentencing on Tennessee Code Annotated section 40-35-115(b)(5), that the Defendant stood "convicted of two (2) or more statutory offenses involving sexual abuse of a minor." The trial court properly considered "the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims." *Id.* The trial court found that the Defendant had exploited the close relationships between the families and among the children to gain access to the victim, that the victim's mother felt safe leaving the victim in the Defendant's care, that the abuse spanned a number of weeks, that the Defendant raped the victim repeatedly, and that the victim suffered serious psychological damage.

The trial court did not abuse its discretion in determining either the length of the sentences or the partially consecutive alignment. While the Defendant disagrees with the trial court's finding that the punishment was no greater than that deserved for the offenses committed, a sentence which is in the appropriate range and reflects an application of the purposes and principles of sentencing is reviewed only for abuse of discretion. *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). The trial court considered the purposes and principles of sentencing, and the Defendant has not demonstrated that the aggregate sentence resulted from the application of an incorrect legal standard, an illogical conclusion, a clearly erroneous assessment of the evidence, or reasoning which has perpetuated an injustice. Accordingly, the Defendant's sentences are affirmed.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE